UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BETTY HARKEY, GLEN GRAYSON, and DOREEN MAZZANTI, individually and on behalf of themselves and all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | CASE NO.  3:13-cv-01799 (WWE) CASE NO.  3:15-cv-00857 (WWE) |
| V. | : : | |
| GENERAL ELECTRIC COMPANY, | : : | |
| Defendant. | : | JUNE 2, 2016 |

**DEFENDANT GENERAL ELECTRIC COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO PRECLUDE THE EXPERT REPORT AND <u>TESTIMONY OF THOMAS L. READ</u>**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

I.   BACKGROUND ............................................................................................................... 2

II.  DAUBERT STANDARD ................................................................................................. 3

III. ARGUMENT .................................................................................................................... 5

    A.  Read's Opinions Regarding the Alleged Design Defect Should Be
        Precluded under Daubert Because They Are Unreliable ....................................... 5

    B.  Read Should Be Precluded from Testifying About Alternative Design
        Theories Because They Are Unreliable ................................................................ 10

        1.  Read Did Not Test His Alternative Designs ............................................ 11

        2.  Read's Theories Have Not Been Subjected to Peer Review or
            Published ................................................................................................... 13

        3.  Read's Theories Have No Known Rate of Error ..................................... 14

        4.  Read's Theories Are Not Generally Accepted ......................................... 14

IV.  CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...................................................................................................7

*Auther v. Oshkosh Corp.*,
  No. 09-cv-00527, 2013 U.S. Dist. LEXIS 132600 (W.D.N.Y. Sept. 16, 2013) ........................9

*Beruashvili v. Hobart Corp.*,
  No. 05-cv-1646, 2010 U.S. Dist. LEXIS 146015 (E.D.N.Y. July 14, 2010) ...........................15

*In re Breast Implant Litig.*,
  11 F. Supp. 2d 1217 (D. Colo. 1998) .....................................................................................13

*Brooks v. Outboard Marine Corp.*,
  234 F.3d 89 (2d Cir. 2000) .....................................................................................................13

*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*,
  No. 13-MD-2434, 2016 U.S. Dist. LEXIS 29752 (S.D.N.Y. Mar. 8, 2016) ...........................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ......................................................................................................1, 3, 11

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ......................................................................................5

*Doe v. Am. Med. Sys., Inc.*,
  96 Fed. App'x. 758 (2d Cir. 2004) ...........................................................................................9

*In re Ford Tailgate Litig.*,
  No. 11-cv-02953, 2015 U.S. Dist. LEXIS 159534 (N.D. Cal. Nov. 25, 2015) ........................6

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................................4

*Kass ex rel. Kass v. W. Bend Co.*,
  No. 02-cv-3719, 2004 U.S. Dist. LEXIS 22217 (E.D.N.Y. Nov. 4, 2004) .............................13

*Kovaco v. Rockbestos-Surprenant Cable Corp.*,
  No. 3:11cv377, 2014 U.S. Dist. LEXIS 21039 (D. Conn. Feb. 20, 2014) ..............................11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................4, 11

*Pozefsky v. Baxter Healthcare Corp.*,
  No. 92-cv-0314, 2001 U.S. Dist. LEXIS 11813 (N.D.N.Y. Aug. 16, 2001) ............................ 13

*Raynor v. Merrell Pharms.*,
  104 F.3d 1371 (D.C. Cir. 1997) ........................................................................................... 13

*United States v. Morgan,*
  No. 1:12-cr-223, 2014 U.S. Dist. LEXIS 145687 (S.D.N.Y. Oct. 2, 2014) ............................. 5

*Zaremba v. General Motors*,
  360 F.3d 355 (2d Cir. 2004) ................................................................................................ 13

**Other Authorities**

Federal Rule of Evidence 702 ........................................................................................................ 1

Pursuant to Federal Rule of Evidence 702 and the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, the Defendant General Electric Company ("GE"), moves to preclude the expert testimony of Thomas L. Read, who is Plaintiffs' proffered expert regarding the alleged design defect that is at issue in the instant action. Plaintiffs allege that certain models of GE-branded microwave ovens ("MWOs") (1090/1095s) are defectively designed because the hinge spring rubs on the door glass, which in turn allegedly causes the glass to spontaneously shatter.

Read's opinions should be precluded in their entirety. First, based on his incomplete examination[1] of *only* ten (10) of the over ▬▬▬ MWOs ever manufactured (between 1995 and 2007), Read concludes that all 1090/1095 MWOs contain the same design defect. Read makes this sweeping generalization even though he had to admit that the cause of breakage of one of the MWOs he did inspect was for a reason **other** than the alleged design defect. Read also conceded that even within the few MWOs he did inspect, there was significant variability as to the hinges contained in the MWO doors, including their positioning, the degree of rubbing on the glass, etc. Indeed, Read had to admit that even within the same MWO, one hinge may have contacted the glass while the other did not due to the manner in which they were manufactured and installed. Ultimately, Read's "extrapolation" theory is based on an insufficient sampling size and fails to address the undisputed fact that over 99 percent of 1090/1095 MWOs did not experience glass door breakage during the history of the product line.

Alternatively, even if Read is allowed to testify on certain topics, his testimony regarding alternative design theories should be excluded as unreliable. Specifically, Read opines that:

---

[1] As explained, *infra*, the glass doors in three of the MWOs were not broken, three others had glass missing so the glass containing the fracture origin could not be examined, and one MWO glass door shattered for an entirely different reason (which Read concedes).

1

(1) there should either be more clearance between the hinge spring and the glass, (2) there should be a protective barrier between the hinge spring and the glass, or (3) annealed low thermal expansion glass should have been used rather than tempered glass. Plaintiffs have not satisfied any of the four factors identified in *Daubert* with respect to Read's opinions about alternative designs. Specifically, Read impermissibly relies on his "unspecified experience" and has not tested his designs, subjected them to peer review or publication, identified a known rate of error, or shown general acceptance of either his design or his methodology. Indeed, it is undisputed that Read's alternative design theories were created solely for the purpose of this litigation, further undermining the reliability of his opinions. The trial court's gatekeeping function requires more than simply taking Read's word for it.

I.  **BACKGROUND**

Plaintiffs allege that all of the MWO doors that have broken over the years were due to a mis-designed door hinge spring, which allegedly rubs on the door glass and causes it to shatter. Am. Compl. (Dkt. No. 157) ¶ 28 ("the cause of the glass shattering is interface between the inside surface of the glass and the hinge spring inside the door assembly."); *see also* Plaintiffs' Brief in Support of Motion for Class Certification, Dkt. No. 163 at 1 ("GE's 1090/1095 microwaves have an unprotected gap between their spring loaded hinge and outer glass door, which allows the metal spring to rub against the glass surface over time, eventually causing it to self-destruct."). Thus, Plaintiffs' claimed mode of failure is the spontaneous shattering of the 1090/1095 MWOs' glass doors caused by a mis-designed door hinge spring, and not other modes of door breakage such as dropping the MWO, the glass cracking, or immediate breakage from impact with another object, among others.

Based on his examination of only ten MWOs, Read concludes that the MWOs have a common design defect that causes the outer door glass to shatter. Declaration of Thomas L.

Read, Ph.D. ("Read Decl."), attached as <u>Exhibit A</u>, at p. 30, ¶ 56.  Specifically, Read opined that there is not enough clearance between the hinge spring and the exterior glass and, as a result, the side of the spring rubs against the glass door, causing it to spontaneously self-destruct over time. *Id.* at p. 30, ¶¶ 54-56.  According to Read, either there should be more clearance, there should be a protective barrier between the hinge spring and the glass, or a different type of glass should be used in the MWO door.  *Id.* at p. 3, ¶ 6.

## II.     *DAUBERT* STANDARD

Pursuant to Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

It is the duty of the trial judge, as the gatekeeper, to "ensure that any and all scientific [technical, or other specialized] testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.'s* admonition, 509 U.S. 579, 589 (1993).  "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be . . . supported by appropriate validation – i.e. 'good grounds,' based on what is known." *Id.* at 590. Thus, an expert opinion must be based on more than mere "subjective belief or unsupported speculation." *Id.*  Ultimately, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one.  Its overarching subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." *Id.* at 594-95.

Indeed, just because an expert says a conclusion is so, does not make it so. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Expert opinions must be backed up by sufficient data; without supporting facts and data, expert conclusions are merely speculative and therefore unreliable. *Id.* at 140, 146-47 (holding that the district court did not abuse its discretion by excluding expert testimony that did "not rise above subjective belief or unsupported speculation."); *see also* Rule 702, Advisory Committee Notes (2000 Amendments) ("An expert who testifies primarily from experience must explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

Reliability may also be judged by the validity of the particular methodology employed by the expert desiring to testify. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999) (agreeing with the district court that "initially doubted, and then found unreliable, 'the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis'"). The key question is not the general methodology employed by the expert, but "whether the 'principles and methods' employed by an expert 'have been properly applied to the facts of the case.'" *Id.* at 157 (quoting Advisory Committee's Note on Proposed Fed. Rule Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment 126 (1998)); *see also* Fed. R. Evid. 702 (expert testimony admissible if it "is the product of reliable principles and methods, and . . . the witness has applied the principles and methods to the facts of

the case."); *Davis v. Carroll*, 937 F. Supp. 2d 390, 415 (S.D.N.Y. 2013) (holding that the law of expert testimony "demands the same level of methodological rigor from an expert in the courtroom as in the expert's ordinary practice" and excluding expert testimony that did not conform to industry practice as applied to the facts of the case).

It is Plaintiffs' burden to establish that the proposed expert testimony is reliable under the standards of *Daubert* and its progeny. *United States v. Morgan*, No. 1:12-cr-223, 2014 U.S. Dist. LEXIS 145687, at *18 (S.D.N.Y. Oct. 2, 2014) (Marrero, J.) ("In determining the admissibility of expert testimony, 'it is the proponent's burden under *Daubert* to establish admissibility, rather than the opponent's burden to establish inadmissibility.'").

### III. ARGUMENT

#### A. Read's Opinions Regarding the Alleged Design Defect Should Be Precluded Under *Daubert* Because They Are Unreliable.

Read's conclusions regarding the alleged design defect are the result of impermissible and unjustifiable extrapolation because his sample size is simply too small to have any predictive value and his conclusions are not supported by the evidence. In the instant action, Read only examined ten of the over ▬▬ 1090/1095 MWOs at issue in this case. In an exercise of circular reasoning, Read then assumed that the conclusions he reached concerning those ten MWOs were common to all ▬▬ 1090/1095 MWOs based solely on the few he did examine:

> Q. Is it your testimony that if we opened up, hypothetically, any of the ▬▬ 1090/1095 microwaves in existence that we would find a spring bulging in every single one of them?
> A. That's been my experience, yes.
> Q. Your experience based on what?
> **A. The ten that I looked at.**

Deposition of Thomas L. Read, Ph. D. ("Read Dep."), attached as Exhibit B, at 109:6-13 (emphasis added).

5

Read's opinions (which are being offered to support a nationwide class action) are not only based on his examination of only 0.015% of the total units sold, but moreover, the ones he did examine do not even support his theories. There are multiple fundamental problems with Read's cursory analysis. First, Read conceded that one of the ten had a glass door break because of a problem at the handle and <u>not</u> due to the alleged design defect. Read Decl. (Ex. A) at pp. 4-5, ¶ 15 (conceding that the glass failure of one of the MWOs originated at the upper right handle hole). In addition, even where the MWO doors had not broken, Read speculated that it would eventually break in the future. Read Dep. Tr. (Ex. B) at 65:6-11. Finally, the glass in three other MWOs was not present for examination, and thus, Read performed a failure analysis without actually inspecting the glass at issue (a practice that Read himself has criticized other experts for doing). Read Dep. Tr. (Ex. B) at 47:1-16. Read testified that it is <u>impossible</u> to conduct a glass failure analysis without the identification of the potential fracture initiation sight. *Id.* at 44:23-46:17 (testifying that without the fracture origin, an expert cannot determine the cause of a failure). Indeed, Read testified that this was the **first time in his nearly 40 year career** as an expert where he testified about the cause of a glass breakage without having the glass available to him. *Id.* at 21:12-15, 164:8-11.

As a result, Read's attempt to extrapolate from his flawed examination of a scant number of MWOs that all ▓▓▓▓ MWOs are defective is hopelessly unreliable, particularly when he had no explanation for why 99% of the MWO glass doors never shattered. For example, in *In re Ford Tailgate Litig.*, No. 11-cv-02953, 2015 U.S. Dist. LEXIS 159534 (N.D. Cal. Nov. 25, 2015), the plaintiffs' expert examined 87 tailgates of Ford Explorer SUVs to determine the rate of failure of a defective polymer appliqué that was causing the tailgate windows to shatter, ultimately concluding that 94.3% of the 2002 to 2005 Ford Explorer fleet's tailgate appliqués

6

were defective.  *Id.* at *20-21.  The district court pressed two primary concerns about the testimony that also exist here.  First, the court noted that "[h]is sample size is very small and unrepresentative of vehicles that are still functioning and on the road."  *Id.* at *24.  Second, to the extent that the expert wished to extrapolate from these limited observations, the court noted that advanced statistical modeling was required, which the expert was not qualified to do.  *Id.*

Like the expert in *Ford*, Read is essentially offering a statistical opinion about the probable rate of failure of the MWOs, but, also like the expert in *Ford*, he is unqualified to do so and his data set is too small and does not account for the nearly 99 percent of MWOs that did not have an incident.[2]  Indeed, the lack of reliability for Read's design defect theory is evidenced by the fact that Plaintiffs' actual statistical expert disagrees with it and testified that a 100 percent defect rate would be "crazy."  Deposition of Abraham Wyner ("Wyner Dep."), attached hereto as Exhibit C, at 129:19-130:9 (testifying that, at most, in the future, the failure rate of 1090/1095s would be between 1% and 2%).  For this reason alone, Read's opinions should be excluded.  *See also American Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (reversing district court's denial of motion to exclude expert because expert's inspection of only one allegedly defective Honda Gold Wing motorcycle, out of the entire fleet produced from 2001 to 2008, was insufficient to support the expert's finding that the entire fleet suffered from a design defect wobble problem).

Furthermore, Plaintiffs' attempt to use Read to support their putative class action flounders on the significant variability that Read discovered while examining the ten MWOs.  Both Read and GE's design expert agreed that there were multiple reasons why the MWO glass doors could break.  Read Dep. Tr. (Ex. B) at 102:18-103:17; Declaration of Paul Verghese, Ph.D.

---

[2]   *See* Thomas Read's Resume, Read Decl., (Ex. A) App. A (containing no statistical experience or credentials).

("Verghese Decl."), attached as <u>Exhibit D</u>, at pp. 94-95, ¶ 128(5), (6).  Further, both experts agreed that there were significant amounts of variability with respect to the hinge springs, wherein the left side hinge may contact the glass while the right side did not.  Read Dep. Tr. (Ex. B) at 93:23-25; Verghese Decl. (Ex. D) at p. 83, ¶ 117.  Read also identified other areas of variability, including:  (a) variation in the thickness of the "base," which is part of the bracket, which variation "would move the spring closer to the glass or further away" (Read Dep. Tr. (Ex. B) at 58:2-18); (b) the length of the spring, as "the longer the spring is, the more you're going to have to twist and squeeze it to fit it in and that's going to cause it to bulge." (*id.* at 58:19-59:6); and (c) variation in the strength of the glass.  *Id.* at 73:21-74:14.

Read also made no effort to analyze the other reports of glass breakage reported by consumers to GE to determine whether they supported his theory or not.  *See id.* at 103:12-106:10 (Read testified that he reviewed GE's Safety Database excerpts for only about half an hour, and even though he admitted that he noticed that at least one entry was a MWO "that had been dropped," he "didn't focus on it").  Indeed, Read ignored the reports of glass breakage that had nothing to do with his claimed design defect.  *See* Verghese Decl. (Ex. D) at p. 88-89, ¶ 126 (noting several instances of glass breakage having nothing to do with Read's claimed design issue in addition to instance where fracture initiated at the handle).[3]  Read admitted, however,

---

3      Examples include:

[redacted]

8

that consumer use of the MWO "could be contributing to the rubbing," which further emphasizes the individualized issues that exist in this case. Read Dep. Tr. (Ex. B) at 106:4-11.

Even further undermining the reliability of Read's opinions is the fact that, in reaching his conclusions, he failed to consider the useful life of MWOs. *Id.* at 148:12-17, 149:12-19 (testifying that he "wasn't asked to figure [the useful life of a MWO] out" and has "no idea" what it is). Indeed, courts within the Second Circuit have excluded experts who, like Read, failed to consider the useful life of the product at issue in design defect cases. *See*, *e.g.*, *Auther v. Oshkosh Corp.*, No. 09-cv-00527, 2013 U.S. Dist. LEXIS 132600, at *12 (W.D.N.Y. Sept. 16, 2013) (excluding expert who "did no testing on the diaphragm's rubber to determine its useful life, durability, or how it is affected by the environment"). The reason why that is so significant in this case is that Read had to admit that nearly 99 percent of the units sold did not have an incident. Despite this undisputed fact, Read opined that all of the units were defective, even in the face of the variability with the inspections, other causes of breakage identified, and the long service life of the population and high survival rate. *See* Verghese Decl. (Ex. D) at p. 7, ¶ 19. Read's opinions are also undermined by Plaintiffs' statistical expert, who opined that a 100% failure rate of these MWOs would be "crazy" and "absolutely out of the question." Wyner Dep. Tr. (Ex. C) at 129:19-130:9.

The weakness of Read's analysis and the fact that he needed to resort to sweeping generalizations is not surprising since he has no experience in the design of MWOs, appliance doors, springs or hinges. Read Dep. Tr. (Ex. B) at 51:13-18 (testifying that he has never designed a MWO or a door with a hinge); *see also Doe v. Am. Med. Sys., Inc.*, 96 Fed. App'x.

---

*See* Verghese Decl. (Ex. D) at p. 89, ¶ 126.

9

758, 759 (2d Cir. 2004) (affirming district court decision to exclude testimony concerning design of penile implants by expert who, despite having "substantial engineering credentials," lacked expertise concerning medical devices). In light of the foregoing, Read's expert report and testimony should be precluded.

> **B.  Read Should Be Precluded from Testifying About Alternative Design Theories Because They Are Unreliable.**

In connection with his examination of the ten (10) MWOs, Read offers several untested alternative design theories that he claims could or should have been implemented to prevent the alleged design defect at issue in this case. Specifically, without performing any testing, Read opines that the glass in the MWOs should have been replaced with annealed low thermal expansion glass. Read Dec. at p. 4, ¶ 13. He further opines, again without testing, that there should either be more clearance or a protective barrier between the hinge spring and the glass. *Id.* at p. 30, ¶ 56.

Even before addressing the four factors for reliability set forth in *Daubert*, *see infra*, Read's opinions concerning his alternative design theories fail to pass muster. Read had great difficulty even articulating the bases for his alternative design theories. He instead justified the feasibility of his alternative design theories relying solely on his engineering experience generally, and provided no alternate bases for his conclusions. Read Dep. Tr. (Ex. B) at 111:3-12 (asserting that he believes his alternative design theories are feasible "just from [his] engineering experience"). For instance, when asked to explain how his experience leads to his alternative design theory on annealed glass replacement, Read testified: "that's a tough one" and admitted that he does not "have any way to actually prove [his theory]," but rather it is "just [his] engineering opinion." *Id.* at 123:4-22.

10

Indeed, his lack of foundation for his design theories for a microwave oven door is not surprising since Read himself admitted that his general experience does not even include experience with MWO design or even the design of springs or hinges.  *Id.* at 134:11-15, 138:20-22.  Notably, however, when an expert opinion primarily relies upon the expert's experience, the expert must explain "how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, No. 3:11cv377, 2014 U.S. Dist. LEXIS 21039, at *18 (D. Conn. Feb. 20, 2014); *see also* Fed. R. Evid. 702 advisory committee's note (2000 Amendments) ("The trial court's gatekeeping function requires more than simply "taking the expert's word for it.").  Read has not done that here.

Independent of this issue, Read's opinions also are not reliable under the factors set forth in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  In *Kumho Tire*, the Supreme Court stated that a trial judge may consider:  (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community.  *Id.* at 149-50 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94 (1993)).  Read's alternative design theories satisfy none of these standards.

### 1. Read Did Not Test His Alternative Designs

Read testified that he has not tested any of his alternative designs.  Read Dep. Tr. (Ex. B) at 63:18-64:7.  Specifically, he admitted that he had not put together a prototype or done <u>any testing whatsoever</u> to determine whether any of his alternative design theories were actually feasible.  *Id.* at 111:3-18.  Further, Read admitted that he had no idea whether implementing his alternative design theories could lead to problems with the MWOs that were perhaps even more serious than the alleged defect in this case.  *Id.* at 111:19-23.

11

When specifically asked about a statement in his report that there should either be more clearance or there should be a protective barrier between the hinge spring and the glass, Read was unable to provide any reliable support for his opinions nor was he able to quantify the amount of clearance that would be needed between the spring and the glass or say with any degree of certainty whether providing for such clearance would even be feasible. *Id.* at 129:3-132:19.

Similarly, when asked about his theory that the MWOs should have been made with annealed glass, Read similarly had no support for his theory, stating simply: "[I] haven't done any experiments. I don't have any way to actually prove that. It's just my engineering opinion." *Id.* at 123:20-22. Read was likewise unable to opine concerning the cost of implementing his annealed glass theory and admitted that he knew of no other manufacturer in the MWO industry that uses annealed glass in its MWOs. *Id.* at 127:19-128:8.

Further, when asked similar questions concerning the feasibility of his theory that there should be a protective barrier between the hinge spring and the glass, Read did not know what material the barrier should be made out of, the cost of adding the barrier, how large or thick the barrier should be, or whether and to what extent there should be a gap between the spring and the barrier. *Id.* at 131:10-132:19 ("Well, you're getting into a lot of design detail that I'm just not – I don't have the data to prove it one way of the other. . . . I wasn't asked to redesign the microwave oven. . . . [Y]ou'd have to do some experimentation and this and that and the other, and I haven't done anything."). Without any meaningful articulation of his theories, they are not even testable.

Federal courts in the Second Circuit routinely exclude expert testimony regarding a safer alternative design where the expert failed to do any testing to demonstrate the design's

12

feasibility. *See*, *e.g.*, *Zaremba v. General Motors*, 360 F.3d 355, 359 (2d Cir. 2004) (affirming trial court holding to exclude expert where expert had not tested alternative safer design theory for automobile involved in accident); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (affirming decision to exclude expert testimony that a "kill switch" could have prevented boating accident where expert had not conducted "any actual testing to determine whether the use of a lanyard-activated kill switch would have disengaged the engine under the circumstances"); *Kass ex rel. Kass v. W. Bend Co.*, No. 02-cv-3719, 2004 U.S. Dist. LEXIS 22217, at *6-10 (E.D.N.Y. Nov. 4, 2004) (granting manufacturer's motion to exclude expert testimony because expert did not adequately test his alternative designs for the alleged defective coffee maker, and his testing methodology was unreliable because it was not subject to peer review nor was it generally accepted in the engineering community).

### 2. Read's Theories Have Not Been Subjected to Peer Review or Published

Read admitted that his theories have never been subjected to peer review and publication. Read Dep. Tr. (Ex. B) at 29:11-30:5 (admitting that he has not published any articles, letters to the editor, or any other peer-reviewed materials). This issue is "particularly important where conclusions have been drawn solely for purpose of litigation: 'a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.'" *Raynor v. Merrell Pharms.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997) (citing *Daubert*, 43 F.3d at 1317). Here, Read himself admitted that his alternative designs were provided solely for the purpose of litigation, further exacerbating the unreliability of his theories. Read Dep. Tr. (Ex. B) at 132:16-19.

Courts routinely exclude expert opinions created solely for the purpose of litigation. *See*, *e.g.*, *Pozefsky v. Baxter Healthcare Corp.*, No. 92-cv-0314, 2001 U.S. Dist. LEXIS 11813, at *17 (N.D.N.Y. Aug. 16, 2001) (excluding expert opinions because, *inter alia*, they were "created

13

solely for the purpose of litigation"); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1242-43 (D. Colo. 1998) (finding expert unqualified by "knowledge, skill, experience, training, [and] education" and noting that his proposed testimony was untested, unpublished in peer reviewed literature, not supported by generally accepted scientific data, not created through the use of any definable scientific methodology, and not developed independent of litigation).

### 3. Read's Theories Have No Known Rate of Error

Read has no idea whether his alternative design theories have a high known or potential rate of error because his theories have not been tested. Read Dep. Tr. (Ex. B) at 111:19-23 (admitting that he has no idea whether or not his theories are feasible or whether they might cause other problems that are perhaps more serious) (Ex. B). Indeed, Read did not even consider this issue, which is another reason why his opinions should be excluded. *See Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*, No. 13-MD-2434, 2016 U.S. Dist. LEXIS 29752, at *64 (S.D.N.Y. Mar. 8, 2016) (excluding expert pursuant to *Daubert* because, *inter alia*, expert's mechanism had "produced no known or potential rate of error" because, as is the case here, it had not been tested) (internal quotations omitted).

### 4. Read's Theories Are Not Generally Accepted

Read does not know whether his theories are generally accepted in the MWO design community – perhaps because he is not a member of it. Read Dep. Tr. (Ex. B) at 134:11-15 (never previously qualified as an expert on hinge or spring design), 138:20-22 (never previously qualified to testify as an expert on microwave oven design); *see also Zaremba v. General Motors Corp.*, 360 F.3d 355, 359-60 (2d Cir. 2004) (upholding the exclusion of proposed expert testimony concerning the defective design of a car roof and windshield by proffered expert who only had experience designing automobile air bags and consulting for litigation). Nor has he identified makers of similar equipment who have already put into use the alternative design that

has been proposed. *Beruashvili v. Hobart Corp.*, No. 05-cv-1646, 2010 U.S. Dist. LEXIS 146015, at *22 (E.D.N.Y. July 14, 2010) (to prove the existence of a feasible safer alternative design, "a plaintiff must proffer an expert who . . . can identify makers of similar equipment who have already put into use the alternative design that has been proposed'"). Accordingly, Read should be precluded from testifying about any alternative design theories.

### IV. CONCLUSION

For the foregoing reasons, GE respectfully requests that the Court grant its Motion and order that Read's opinions be excluded in their entirety. In the alternative, even if Read is allowed to testify on certain topics, GE respectfully requests that the Court exclude his opinions regarding alternative design theories.

DEFENDANT
GENERAL ELECTRIC COMPANY


By_____/s/ Sorell E. Negro_____
John H. Kane (ct12273)
E-mail: jkane@rc.com
Jeffrey J. White (ct25781)
E-mail: jwhite@rc.com
Wystan M. Ackerman (ct24090)
E-mail: wackerman@rc.com
Sorell E. Negro (ct29195)
E-mail: snegro@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

15

## **CERTIFICATION**

I hereby certify that on June 2, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____*/s/ Sorell E. Negro*_____
Sorell E. Negro