# EXHIBIT A3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GLEN GRAYSON, and DOREEN
MAZZANTI, individually and on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,

Defendant.

Case No. 3:13-cv-01799-WWE

Rebuttal Declaration

of

**COLIN B. WEIR**

March 23, 2016

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I.  QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I am the same Colin B. Weir who has previously testified in this proceeding.[1]  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is annexed hereto as Exhibit 1.

## II.  ENGAGEMENT

2.    I have been advised by Counsel for Plaintiffs that a putative Class of individuals purchased General Electric ("GE")-branded Microwaves[2] that suffer from a material defect that can result in the shattering of the glass door of the Microwaves in a dangerous manner, and that this defect was not disclosed to consumers.  I have been asked by Counsel for Plaintiffs to review the Declaration of William S. Choi[3] and respond thereto.

3.    ETI is being compensated at the rate of $550 per hour for my work on this case.

4.    In forming these opinions, I have relied upon my educational background, more than 12 years of experience, and the documents cited in the body of, and Exhibit 2 attached to, this report.

---

[1] Declaration of Colin B. Weir, October 15, 2015 ("Weir Declaration").

[2] GE-branded microwave oven model numbers JEB1095, ZMC1090, and ZMC1095, hereinafter "the Microwaves" or "the Products."

[3] Expert Report of William S. Choi, Ph.D., January 4, 2016 ("Choi Declaration").



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 2 of 27

### III.  RESPONSE TO CHOI

5.    At the core, Choi conflates the presence of the defect in each of the Products with the manifestation of the defect.  My understanding of Plaintiff's theory of liability in this case is that all of the Products contained the defect, and were of diminished value and/or should not have been sold.  As such, Choi inappropriately focuses on the wrong measure of harm in this case: considering only situations where the defect has manifested, rather than the presence of the defect.  This disconnect results in Choi drawing a number of specious and inapposite conclusions.

**The manifestation of the product defect does not impact any of the methodologies I have proposed to calculate classwide damages in this case**

6.    Choi asserts that the manifestation of the Product safety defect is material to the calculation of classwide damages in this matter.[4]  However, he ignores the fundamental point that the product defect is present in *all* of the Products sold regardless of whether or not it actually manifests in each microwave purchased.  As I noted in my opening Declaration,[5] Plaintiff's expert Dr. Thomas Read makes clear in his Declaration that the "defect is endemic not only to the MWOs [he] inspected, but to the entire 1090/1095 model lines" because "as established by GE's own documents and testimony as well as other evidence, 1090/1095 MWOs all share a common design with respect to their specific door assembly."[6]  As such, the economic damages that I have set forth in the Weir Declaration are unaffected regardless of whether 1% or 100% of the microwaves manifest the defect because all of the Products contain the defect and suffer a diminution in value.

---

[4] *Id.*, at para 18.

[5] Weir Declaration, at para 11.

[6] Declaration of Dr. Thomas L. Read, October 15, 2015 ("Read Declaration"), at para 57.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 3 of 27

**The life expectancy of the Products is irrelevant to the calculation of classwide damages**

7.    Choi claims that the life expectancy of the Products might have some effect on the calculation of classwide damages.[7]  As I have discussed above, all of the Products are defective, and have diminished value.  As such, the appropriate moment to measure this type of economic damages is *at the time of sale*.  Similarly, disgorgement damages in this case are premised upon the notion that the Products never should have been sold at all.  As I explain in my deposition,[8] disgorgement damages are measured from the perspective of the defendant, and essentially unwind the transactions.  Disgorgement damages are also calculated at the time of sale, since the transaction itself is synonymous with the time of sale.  As such, the lifespan of the Products is inapposite to the measurement of damages in this case.

**Consideration of a but-for world in which consumers were aware of the defect prior to purchasing the Products is inappropriate and is not material to the calculation of classwide damages in this case**

8.    Choi improperly suggests that either diminution in value or disgorgement of gains could be affected by a hypothetical scenario in which a higher frequency of manifestation of the defect somehow affects demand for 1090/1095s.[9]  However, consumers purchased the Microwaves without any knowledge of the defect.  Therefore, an analysis of a but-for world in which consumers were aware of the defect would be counterfactual to the actual transactions that occurred in the marketplace.  Regardless of whether Defendant would have sold fewer 1090/1095s or would have sold them at a different price in a but-for world where consumers were aware of the defect, the diminution in value as measured by the cost to repair the Products

---

[7] Choi Declaration, at para 17.

[8] Weir Deposition, at 179, 186.

[9] Choi Deposition, at para 18.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 4 of 27

would not be affected by demand for microwaves and therefore the cost of repair would not change.

9.    The cost of repair, as measured by GE's own internal "Factory Service Invoice Database," is determined by the following sum:

cost of labor + cost of trip + cost of parts + taxes - discounts  =  cost of repair (net charge)

10.    None of the above charges would be affected by either a change in the number of 1090/1095s sold or a change in the price of the Microwaves.  Both the cost of labor and the cost transportation are not affected by demand for microwaves.  The cost of replacement parts is not determined by the price of the Microwave.  Taxes are a function of the pre-tax cost of repair (cost of labor + cost of trip + cost of parts), the components of which, as discussed above, are not affected by the price of 1090/1095s.  Finally, as I understand Defendant's testimony,[10] any discount given to a customer who requested a microwave repair was determined by the repair technician or GE's Customer Relations Team and not a fixed or pre-set amount, therefore, the discount also could not possibly be affected by the demand for 1090/1095s.

11.    Perhaps more importantly, the actual supply and demand of the Products in this litigation is fixed as a matter of history.  Choi's discussion of a but-for world ignores the fact that the actual number of Microwaves sold is a known fact.

**Individual considerations are irrelevant to the determination of classwide damages**

12.    Choi asserts that it is necessary to take into account "individualized considerations," essentially the various reasons why consumers chose to purchase 1090/1095s, in order to calculate damages on a classwide basis.  However, Choi does not describe how or why an

---

[10] See, Deposition of James Gothard, April 30, 2015, at 18-24.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 5 of 27

individual's reasons would affect a classwide damage calculation -- he simply states "such variation would need to be taken into account to perform such a calculation accurately."[11] Choi is wrong. Individual reasons for purchase are irrelevant in this case, because a consumer's individual reasons for purchase do not change the revenue received by GE for the Microwaves. Nor do they change the diminution in value (as measured by the cost to repair the Microwave). Furthermore, no matter what an individual consumer's reasons for purchasing the Product may be, all else being equal ALL consumers would have been better off if the defect in the Microwave was not present. Additionally, even if, as Choi describes in a counterfactual hypothetical, some consumers were still willing to pay full price for the Product upon learning about the defect,[12] all else being equal those consumers still would have been better off if the defect in the Microwave did not exist. Therefore, individual reasons for purchase are not material to the calculation of classwide damages either by diminution in value or disgorgement of gains in this litigation.

**Various benefits individuals may have received from the Products are irrelevant to the determination of classwide damages**

13. In addition to the reasons why individuals might choose to purchase a 1090/1095 Microwave, Choi asserts that my damage calculations fail to take into account the benefits an individual consumer received from the Microwave.[13] Again Choi is simply wrong. The benefits an individual consumer received from the Product, much like the reasons why a consumer might have chosen to purchase the Product, do not change the measures of damages in this case, because the benefit an individual consumer receives from the Product has no effect on the

---

[11] Choi Declaration, at para 19.

[12] *Id.*, at para 19.

[13] *Id.*, at para. 20.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 6 of 27

revenue earned by GE nor does it have an effect on the diminution in value (as measured by the cost to repair the Product).  Choi uses the example of the "Microwave Cooking feature" as one feature of the Products that some consumers may have derived some benefit from.  Whether a consumer derived some benefit or no benefit from the "Microwave Cooking feature" does not change the fact that that consumer would have received *even greater value* had she not received a defective Microwave.[14]  This reality is true for any type of benefit consumers may have received.  All else being equal, consumers would have been better off, no matter what, if they received a defect-free Microwave.

**Choi's opinions regarding individual consumers' motivations for purchasing the Products are based upon flawed economic theory**

14.  Choi claims that individual consumer's motivations for purchasing 1090/1095s are material to calculating classwide damages, which (as I have discussed above) is simply incorrect.  However, Choi goes to extraordinary lengths to defend the notion that if consumers in the class based their decision to purchase the Microwave solely on the reliability of the glass door then manufacturers -- such as GE -- "would focus their marketing and engineering efforts exclusively on this attribute, which did not occur."[15]  This is a totally specious argument.  Following Choi's logic, a product could only suffer diminution in value if there was only one reason consumers might purchase that product.  Consumers purchase automobiles for numerous different reasons, yet an automobile can clearly be of diminished value if the engine has a defect, and must be replaced in order to cure that defect.  The same is true of the instant case.

---

[14] See generally, Nicholson, W. and Snyder, C., *Microeconomic Theory: Basic Principles and Extensions* (10th ed.), "Chapter 3: Preferences and Utility", Thomson South-Western, 2008.

[15] Choi Declaration, at para 21.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 7 of 27

**Choi incorrectly assumes that diminution in value depends on the manifestation of the Product defect**

15.    As already discussed, Choi fails to understand the difference between the presence of the defect in the Products and the likelihood that the defect actually manifests itself.  Based on his misunderstanding of the Product defect, Choi proposes "a possible diminution in value" that takes into account the likelihood of breakage.[16]  Choi suggests multiplying the average cost to repair ($253) by the incident rate discussed by Wyner (1.5%), which results in an estimate of diminution in value of $3.79 per unit.  However, Choi's estimate of diminution in value simply does not fit the facts of this litigation.  Plaintiff's expert Read has provided evidence that 1090/1095s "all share a common design with respect to their specific door assembly," which indicates that the defect could have manifested in any one of the Products sold.[17]  Since all the Products contain the defect, taking into account only the microwaves in which the defect manifested would result in a gross underestimation of diminution in value.

16.    Choi's estimate of diminution in value *might* be appropriate if, contrary to the facts of this case, only 1.5% of the Products sold shared the defective design and 98.5% of the Products were designed differently. However, since 100% of the Products shared the same defective design, a proper calculation of diminution in value must take into account all of the Products sold.  Stated differently, the diminution in value (as measured by the cost to remove the defect from ALL of the Products) is correctly calculated as the cost to repair multiplied by the total number of units sold, not the cost to repair multiplied by only 1.5% of units sold.  Therefore, Choi's adjustment of my diminution of value calculation using Wyner's incidence rate does not fit the facts of this litigation, grossly underestimates classwide damages, and does not constitute a proper calculation of diminution in value.

---

[16] *Id.*, at para 28.

[17] Read Declaration, at para 57.


ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 8 of 27

**Choi's assertion that the average cost to repair may not be "an economically meaningful measure" is false and contradicts basic economics and statistics**

17.   Choi argues that the use of the average cost to repair may not be "an economically meaningful measure."[18]   Choi suggests that a complete analysis of the cost of repair database should include a summary of other descriptive statistics including the maximum, minimum, and standard deviation, as well as various percentiles.   He also suggests that if the average cost to repair (described as "Net Charge" in GE's spreadsheet and Choi's Declaration) were similar to the median (50th percentile) then the average would be a good measure of the central tendency of the data.[19]   However, Choi argues that because the median Net Charge differs from the mean, the "average estimate [...does] not provide a meaningful representation of the costs that purchasers would likely expect to occur."[20]   The implication here is that Choi believes the median (or some other statistic), not the average, cost to repair might be more appropriate for use in a classwide damage calculation.

18.   While I do not believe it to be economically appropriate in this instance, Choi himself has demonstrated yet another way to determine the diminution in value, and Choi's median $239.95 estimate could be used as an input into the diminution in value damages formula that I provided in the Weir Declaration.   In Table 1 below, I recast Table 1 from the Weir Declaration using Choi's median cost to repair measure of diminution in value.

---

[18] Choi Declaration, at para 29.

[19] *Id.*, at para 35.

[20] *Id.*, at para 37.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 9 of 27

| Table 1. GE Diminution in Value Damages - Median Cost to Repair | | | |
|---|---|---|---|
| **State** | **Number of Units** | **Cost to Repair** | **Diminution in Value Damages** |
| Total U.S. | ■ | $ 239.95 | $ 16,386,905 |
| Consumer Protection Law Subclass States | ■ | $ 239.95 | $ 3,485,754 |
| U.S. Net of Consumer Protection and Individual State Subclasses | ■ | $ 239.95 | $ 7,036,054 |
| California | ■ | $ 239.95 | $ 1,926,079 |
| Florida | ■ | $ 239.95 | $ 1,120,567 |
| New York | ■ | $ 239.95 | $ 996,752 |
| Ohio | ■ | $ 239.95 | $ 573,481 |
| Texas | ■ | $ 239.95 | $ 1,248,220 |
| Total of Individual State Subclasses | ■ | $ 239.95 | $ 5,865,098 |
| Data Sources:  GE_RC064115_Confidential_MWO_HARKEY prod final.XLSX, GE-MWO-NATIONAL-SALES-1090+1095MODELS-1996-PRESENT sent 7_24_2014.XLSX, and GE_RC063312_Confidential Harkey Financial Data.xlsx | | | |

19.   There are many compelling reasons why the average (mean) cost to repair and not the median cost to repair is more appropriate to use in a classwide damage calculation.  Contrary to Choi's description of the concept of average, the standard mathematical definition of the average (or mean) is *the expected value* -- the two terms are mathematically equivalent and interchangeable.[21]  Therefore, when Choi states the "average estimate [...] would not provide a

---

[21] Given a random variable *Y*, "[t]he expected value of *Y* is also called the expectation of *Y* or the mean of *Y*"; Stock, J. H. & W. W. Watson, *Introduction to Econometrics* (3rd ed.). Boston: Addison-Wesley, 2011 ("Stock & Watson"), at 18.



meaningful representation of the costs that purchasers would likely expect to occur," this statement is simply false.[22]

20.   Second, the average or expected Net Charge multiplied by the number of Net Charges, by definition, equals the total sum of all the Net Charges.  For this reason (and others), the average Net Charge is a more appropriate statistic than the median to use in estimating total classwide damages.

21.   Finally, as discussed below at paragraph 27, a sensitivity analysis in which the most extreme Net Charges are removed from the dataset demonstrates that an estimate of total classwide damages using the average Net Charge is not sensitive to so-called "outliers."

22.   A comparison of classwide damages calculated using the average cost to repair and the median cost to repair demonstrates why the average is an economically meaningful statistic. In any dataset that contains economic or financial data some variation in that data will exist. However, this variation does not render the data useless.  In this particular case, Defendant has provided a cost of repair database, which Defendant describes as the "Factory Service Invoice Database."[23]   As I demonstrate below in Table 2, the average (or mean) Net Charge multiplied by the total number of Net Charges equals the sum of all the Net Charges while the median Net Charge multiplied by the total number of Net Charges does not.

---

[22] Choi Declaration, at para 37.

[23] *See, e.g.,* Gothard Deposition, at 52.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 11 of 27

| | Summary Statistics | Net Charge |
|---|---|---|
| **Table 2.** **Comparison of Total Classwide Damage Estimates** | | |
| [A] | Mean | $    252.98 |
| [B] | Median | $    239.95 |
| [C] | Number of Net Charges | 761 |
| [D] | Total Sum of Net Charges | $ 192,517.82 |
| **Total Classwide Damage Estimates Mean vs. Median** | | |
| [E] = [A] × [C] | Mean × Number of Net Charges | $ 192,517.82 |
| [F] = [B] × [C] | Median × Number of Net Charges | $ 182,601.95 |
| [G] = [F] ÷ [E] − 1 | % Difference | -5.1% |
| Data Source:  GE_RC064115_Confidential_MWO_HARKEY prod final | | |

23.   The table above shows that an estimation of total classwide damages using the median underestimates the total sum of Net Charges by more than 5.1%.

24.   Choi's own criticisms of the skew of the data set underpin why the median is not a reliable indicator of damages in this case.  As Choi correctly points out, the reason why the median Net Charge is approximately $13.00 less than the mean Net Charge is because the data is skewed left.[24]  If instead the data was skewed right, rather than being smaller than the mean, the median Net Charge would be greater than the mean, and classwide damages calculated using the median would actually exceed the total sum of the average derived from the Net Charges, which is nonsensical.

25.   As an illustration of the potential problem with Choi's method, Table 3 summarizes and compares two sets of data points in which the data is skewed left and right, respectively. Figures 1 and 2 show the distribution of each dataset.

---

[24] Choi Declaration, at para 36

ETI    ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 12 of 27

| Table 3. Comparison of Left and Right Skewed Data | | |
|---|---|---|
| **Data** | **Left Skewed Distribution** | **Right Skewed Distribution** |
| 180 | 0 | 2 |
| 190 | 0 | 3 |
| 200 | 0 | 2 |
| 210 | 0 | 4 |
| 220 | 9 | 5 |
| 230 | 15 | 7 |
| 240 | 25 | 9 |
| 250 | 21 | 10 |
| 260 | 10 | 21 |
| 270 | 9 | 25 |
| 280 | 7 | 15 |
| 290 | 5 | 9 |
| 300 | 4 | 0 |
| 310 | 2 | 0 |
| 320 | 3 | 0 |
| 330 | 2 | 0 |
| **Summary Statistics** | **Left Skewed Distribution** | **Right Skewed Distribution** |
| Mean | 255 | 255 |
| Median | 250 | 260 |
| Total Sum of Data | 28,560 | 28,560 |
| Number of Observations | 112 | 112 |
| **Total Classwide Damage Estimates** | **Left Skewed Distribution** | **Right Skewed Distribution** |
| Mean × Number of Observations | 28,560 | 28,560 |
| Median × Number of Observations | 28,000 | 29,120 |
| Difference | 560 | (560) |

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 13 of 27

**Figure 1.**



**Figure 2.**





26.  In the case of the left skewed data, the median underestimates the total sum of the data, while in the case of the right skewed data, the median overestimates the total sum of the data.  In both cases however, the mean multiplied by the number of data points equals the total sum of the data.

**Despite raising the specter of large "outliers" in the data, a sensitivity analysis of my original damages calculation demonstrates that this criticism is unfounded**

27.  Choi argues that the average value of some data is "susceptible to the influence of outliers" and therefore calculating the average Net Charge is not necessarily a meaningful method by which to estimate the classwide cost of repair.[25]  However, Choi presents no evidence that such "outliers" exist in the cost of repair dataset provided by Defendant, nor does he present any sort of analysis that demonstrates the "influence" such "outliers" might have on the calculation of the average Net Charge.  Instead, Choi falsely equates my calculation of the actual average Net Charge of actual repair data to his own fabricated hypothetical example in which he calculates an average income for ten people.[26]

28.  In Choi's example (which is not analogous to the facts of this case) he calculates the average annual income for ten individuals, one of whom earns $10 million annually, the rest of whom earn $15,000 annually.  The average income for these ten individuals is approximately $1 million dollars.  Choi asserts that in this instance "reliance only on the average would provide a false and misleading impression that there are 10 individual millionaires in the room even though nine of the ten people are earning minimum wage."[27]  Choi's example however is not comparable to my analysis in this case, which I demonstrate in the following sensitivity analysis.

---

[25] *Id.*, at para 32.

[26] *Id.*

[27] *Id.*

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 15 of 27

29.  In Choi's example, if the individual with the largest annual earnings is removed from the data, the estimate of average individual earning falls from $1,013,500 to $15,000 -- a difference of $998,500 (-98.52% change).  Clearly, in Choi's fabricated example, the estimate of average earnings is indeed susceptible to the presence of a large outlier.  In the case of the cost of repair database, by following the routine described above, it is possible to evaluate whether or not the calculation of the average Net Charge is sensitive to the presence of outliers.  I conducted a sensitivity analysis by sequentially removing the five largest Net Charges from the cost of repair database; then I calculated the average Net Charge in each case.  Table 4 shows the results of the sensitivity analysis.

| Table 4. Sensitivity Analysis of the Average Net Charge | | |
| --- | --- | --- |
| Number of Observations | Mean Net Charge | Maximum |
| 761 | $ 252.98 | $ 1,261.17 |
| 760 | $ 251.65 | $ 740.60 |
| 759 | $ 251.01 | $ 687.81 |
| 758 | $ 250.43 | $ 660.31 |
| 757 | $ 249.89 | $ 652.67 |
| 756 | $ 249.36 | $ 650.51 |
| Data Source: GE_RC064115_Confidential_MWO_HARKEY prod final | | |

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 16 of 27

**Table 5.**
**Sensitivity Analysis of the Average Net Charge:**
**Minimum Values Removed**

| Number of Observations | Mean Net Charge | Minimum |
|---|---|---|
| 761 | $ 252.98 | $ 0.00 |
| 760 | $ 253.31 | $ 0.00 |
| 759 | $ 253.65 | $ 0.00 |
| 758 | $ 253.98 | $ 0.00 |
| 757 | $ 254.32 | $ 0.00 |
| 756 | $ 254.65 | $ 55.49 |
| Data Source: GE_RC064115_Confidential_MWO_HARKEY prod final | | |

**Table 6.**
**Sensitivity Analysis of the Average Net Charge:**
**Maximum and Minimum Values Removed**

| Number of Observations | Mean Net Charge | Minimum | Maximum |
|---|---|---|---|
| 761 | $ 252.98 | $ 0.00 | $ 1,261.17 |
| 759 | $ 251.99 | $ 0.00 | $ 740.60 |
| 757 | $ 251.67 | $ 0.00 | $ 687.81 |
| 755 | $ 251.43 | $ 0.00 | $ 660.31 |
| 753 | $ 251.22 | $ 0.00 | $ 652.67 |
| 751 | $ 251.02 | $ 55.49 | $ 650.51 |
| Data Source: GE_RC064115_Confidential_MWO_HARKEY prod final | | | |

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 17 of 27

    30.  The first row of Table 4 shows the mean Net Charge and maximum Net Charge for the data I used to calculate the average cost to repair in my first Declaration.[28]  As is evident from the table, when the largest Net Charge ($1,261.17) is removed from the data, the average Net Charge falls by only $1.33 (-0.53% change).  As more large observations are removed from the data, the average Net Charge falls by even smaller amounts.  This demonstrates that the calculation of the average is not sensitive to outliers.  Furthermore, Choi's false equivalence of the cost of repair data to his individual earnings example is completely unfounded and severely misleading.

    31.  Table 5 shows a similar sensitivity analysis to Table 4, except the five smallest Net Charges are removed from the cost of repair data.  The results of this analysis are similar to the results presented in Table 4.  In this case the mean Net Charge increases by $1.67 (0.66% change), which again demonstrates the lack of sensitivity of the average Net Charge to supposed "outliers."

    32.  Table 6 reproduces the same sensitivity analysis, except with both the five smallest and five largest Net Charges removed from the cost of repair data.  Once again, the mean Net Charge is not sensitive to the removal of the most extreme data points.  The average Net Charge decreases by $1.96 (-0.78% change).  The overall results of these three sensitivity analyses demonstrate that Choi's discussion of outliers is hyperbolic and does not at all apply to GE's cost of repair data.

---

[28] *See*, Table 1 of Weir Declaration, at 5.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 18 of 27

**Choi's assertion that entries in the repair database do not relate to the glass door assembly is disingenuous, and his purported controls demonstrate that the entire database provides a reasonable estimate of diminution in value**

33.   Choi asserts that I have not properly supported my use of the average cost to repair on the basis that the cost of repair database produced by Defendant may include Microwave repairs unrelated to the challenged defect.[29]  Choi's criticism is completely inappropriate given that the Defendant represented that the database contained cost of repair data related to glass door replacements.

34.   Choi's suggestion that some of the entries in the cost of repair database are not related to the defect is disingenuous given that GE's own corporate representative testified to a cost to repair figure from the entire database:

> Q.  Does GE have any kind of analysis or understanding of how long an average or typical replacement of a 1090/1095 shattered glass door replacement takes?
>
> A.  We have looked at average service price for -- charge to consumers for ***replacement door assemblies*** on 1090/1095 microwaves.
>
> Q.  Okay. You looked at the average price, so let's address that first. What is that average price?
>
> A.  It's approximately $253.[30]

---

[29] Choi Declaration, at para 40.

[30] Gothard Deposition, at 50.  This calculation is made across the entirety of the repair database. [Emphasis supplied]

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 19 of 27

35.   Furthermore, neither he nor Defendant could definitively point out repairs in the database that were not related to glass door replacement.  In his Declaration Choi himself makes no effort to perform such an analysis.

36.   At his deposition, Choi could not provide any greater detail that he felt would lead to a more accurate measurement of "door only" repair data.[31]

37.   But in his background analysis in preparation for drafting his report, Choi demonstrated another method that could be used in the damage calculation that reaches a comparable result to my calculation.  Choi analyzed the repair database for entries that specifically use the words "glass," "door" and other keywords in the description that would indicate a repair relating to the door of the Microwaves.  Not surprisingly this paring down of the dataset has little impact on the calculation of classwide diminution in value.  Rather than the $253 amount calculated by Defendant itself, Choi calculates the diminution in value to be $244.62.[32]  In Table 7, I recast Table 1 from the Weir Declaration using Choi's estimate of "door only" measure of diminution in value.

---

[31] Deposition of William Choi, Ph.D., March 8, 2016 ("Choi Deposition"), at 26-30.

[32] *See, e.g.,* Bates No. GE_RC064121.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 20 of 27

| Table 7. GE Diminution in Value Damages - "Door Only" Average Cost to Repair | | | |
|---|---|---|---|
| **State** | **Number of Units** | **Cost to Repair** | **Diminution in Value Damages** |
| Total U.S. | ███ | $ 244.62 | $ 16,705,834 |
| Consumer Protection Law Subclass States | ███ | $ 244.62 | $ 3,553,595 |
| U.S. Net of Consumer Protection and Individual State Subclasses | ███ | $ 244.62 | $ 7,172,992 |
| California | ███ | $ 244.62 | $ 1,963,565 |
| Florida | ███ | $ 244.62 | $ 1,142,375 |
| New York | ███ | $ 244.62 | $ 1,016,151 |
| Ohio | ███ | $ 244.62 | $ 584,642 |
| Texas | ███ | $ 244.62 | $ 1,272,513 |
| Total of Individual State Subclasses | ███ | $ 244.62 | $ 5,979,247 |

Data Sources: GE_RC064115_Confidential_MWO_HARKEY prod final.XLSX, GE-MWO-NATIONAL-SALES-1090+1095MODELS-1996-PRESENT sent 7_24_2014.XLSX, and GE_RC063312_Confidential Harkey Financial Data.xlsx

**Disgorgement of gains damages are properly calculated and economically appropriate**

38.  Choi appears to be making legal arguments when he states that my restitutionary disgorgement models are somehow inappropriate.[33]  He does not suggest that I have miscalculated the total wholesale revenue of the Products, and although Choi suggests my profit calculations overstate GE's profit (which I discuss in more detail below), Choi mainly argues against the use of these damage methodologies.

---

[33] Choi Declaration, at para 44.



39.  I have been advised by counsel that certain provisions of the law, when triggered, allow for the recovery of restitutionary disgorgement.  I do not offer a legal opinion as to whether such triggers have been met in this case, but as a matter of economics, the models that I have set forth in the Weir Declaration are both appropriate and do correctly calculate restitutionary disgorgement.

40.  As I have stated in the Weir Declaration, Plaintiff's theory of liability is based on the fact that "the defects in the glass door rendered the Microwaves unfit for the ordinary purpose for which they are used", and therefore, the Products should not have been sold to consumers.[34]

41.  If liability is ultimately established, two economically appropriate measures of damages would be restitutionary disgorgement on the basis of GE's wholesale revenues or profits.

42.   As I discussed above, and at length at my Deposition, disgorgement damages are a defendant-centric analysis that essentially unwind the transactions.  This is the exact method that I have used to calculate disgorgement damages in this litigation.

**Choi's suggestion that I have overstated GE's profits is incorrect**

43.  In his declaration, Choi criticizes my calculation of profits earned by GE on the basis that the data I relied upon contains estimates of some financial data.[35]  However, as with his discussion of the repair database, Choi is being disingenuous: the estimates contained in the profitability workbook that I rely upon *were made by GE itself*, and are standard inputs that GE uses when GE analyzes profitability or sets forth a business case.  When asked at deposition whether or not it is appropriate to rely upon estimates of financial data when no other data is available, Choi agreed that such data can be reliable:

---

[34] Weir Declaration, at para 6.

[35] Choi Declaration, at para 49.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 22 of 27

Q.  Assuming that Mr. Weir was never provided with any non-estimate data,
do you believe he was deficient in making use of the estimates provided by GE
in performing his calculations?

A.  Calculations of profitability. That's your question?

Q.  Yes, I mean, for the section "the disgorgement of profits."

A.  I'd have to take a look at which data points were estimates. Again, to the
extent that the estimates are reliable, certainly they could be used in the
absence of actual data.[36]

44.  In his declaration, Choi also argues that I have overstated GE's profits by failing to
deduct certain "fixed costs" such as rent or other administrative costs.[37]  This suggestion, if
implemented, would be improper because it would result in a number of economic distortions.
The suggestion that general and administrative expenses should be deducted results in such
distortions.  If Jack Welch, GE's former CEO, were to incur greater expenses flying to appliance
conventions, or buying art for GE's corporate offices, or even just upgrading from class B to
class A office space, Choi's theory would have the class receive less in disgorgement damages.
Indeed, Choi's theory would allow Defendant to spend its way out of owing any damages.

45.  More fundamentally, my calculation of GE's profits, set forth in the Weir
Declaration, relies upon financial data that Defendant provided.[38]  If Defendant believed that

---

[36] Choi Deposition, at 36-37.

[37] Choi Declaration, at para 50.

[38] See, GE-MWO-NATIONAL-SALES-1090+1095MODELS-1996-PRESENT sent 7_24_2014.XLSX and
GE_RC063312_Confidential Harkey Financial Data.xlsx



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 23 of 27

certain fixed costs were relevant to the profitability of the Products, then presumably it would have included these costs along with the other financial data it provided.

**Choi's assessment that the damage methodology I have proposed is flawed because PCE data from the U.S. Bureau of Economic Analysis cannot be used to apportion sales of GE microwaves across subclasses is incorrect**

46.  Choi asserts that the methodology I have proposed for apportioning damages is unreliable on the basis that the PCE data I used to apportion 1090/1095 sales may not be correlated with demand for MWOs.[39]  However, Choi's critique is wrong for three main reasons.

47.  First, PCE is an accurate and reliable data source maintained by the U.S. Bureau of Economic Analysis ("BEA").  Personal Consumption Expenditures data is described by the BEA as "the primary measure of consumer spending on goods and services in the U.S. economy," which "also provides a comprehensive measure of types of goods and services that are purchased by households."[40]  Despite his assertion that this data is inappropriate to apportion Microwave sales, Choi also agrees with the BEA's characterization of the data:

> Q.  Putting aside [Mr. Weir's] use of the data in this case, do you agree with the first sentence of the second paragraph that reads "PCE also provides a comprehensive measure of types of goods and services that are purchased by households?"
>
> A.  Well, that's my understanding of PCE.  It's consistent with my understanding.

---

[39] Choi Declaration, at para 52.

[40] Bureau of Economic Analysis (BEA), *Concepts and Methods of the U.S. National Income and Product Accounts*, "Chapter 5: Personal Consumption Expenditures", available at http://www.bea.gov/national/pdf/NIPAhandbookch5.pdf (last accessed March 21, 2016), at 1.



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 24 of 27

Q.  Excuse me?

A.  It's consistent with my understanding of what the PCE is.[41]

48.  Second, regardless of whether or not Choi agrees with my opinion that household expenditure on "Furnishings and Durable Household Equipment" (a category which includes household appliances) from BEA is a good proxy for microwave sales data, the methodology I have proposed is sound.  If more appropriate data by which to apportion sales becomes available, then my methodology is flexible and would allow for the replacement of PCE data for some other metric.  Therefore, Choi's criticism of the PCE data has no bearing on the methodology I have proposed.  In the Weir Declaration, I proposed two alternatives to PCE data -- Real GDP and Population -- either of which could feasibly be used to apportion Microwave sales data.[42]

49.  Third, the PCE data is in fact a reasonable proxy for the share of microwave sales across states and can certainly be incorporated into a damages model to provide a reasonable estimate of the distribution of damages across subclasses, which I will demonstrate.

50.  The "Furnishings and Durable Household Equipment" category, among other expenditure subcategories,[43] includes expenditure on household appliances.  Although it is obvious that the level of household expenditure for the entire "Furnishings and Durable Household Equipment" category in California, for example, differs from the level of expenditure on household appliances in California, it is unlikely that the percent of total expenditure on "Furnishings and Durable Household Equipment" in California will differ significantly from the percent of total expenditures on household appliances.  To demonstrate the lack of variation in

---

[41] Choi Deposition, at 34-35.

[42] See, Weir Declaration, at para 12 and Exhibits 5 & 6.

[43] Components of "Furnishings and Durable Household Equipment": purchases of furniture and furnishings, household appliances, glassware, tableware, and household utensils, and tools and equipment for house and garden, available at http://www.bea.gov/regional/definitions/ (last accessed March 21, 2016).



Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 25 of 27

state level shares of expenditures I compare state shares of GDP to the state level PCE data used

to calculate damages in my first report.[44]  The standard definition of GDP by economists is:

GDP = Consumption + Investment + Government Spending + Net Exports

51.  Since household expenditure on "Furnishings and Durable Household Equipment"

falls into the "Consumption" component of GDP, the PCE data is a subcomponent of GDP.  In

order to test whether the state shares of GDP are similar to the state shares of household

expenditure on "Furnishings and Durable Household Equipment," I have calculated a linear

correlation coefficient to assess how closely Real GDP tracks PCE.  I have also calculated the

correlation between PCE and Population, which could also be used to make reasonable estimates

of the apportionment of 1090/1095 sales across states.  Table 7 shows the correlation coefficients

and Figures 3 and 4 show the linear correlation between state shares of Real GDP and PCE and

state shares of Population and PCE graphically.

| Table 8. Correlation Between State Shares of PCE, Real GDP, and Population | |
|---|---|
| **Variable** | **Linear Correlation Coefficient** |
| Real GDP | 98.38% |
| Population | 99.54% |
| Data Source: http://www.bea.gov/regional/; see also Weir Declaration Exhibits. | |

---

[44] See, Exhibits 4 & 5 of Weir Declaration.



ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
March 23, 2016
Page 26 of 27

**Figure 3.**



**Figure 4.**





52.  The extremely high correlation between Real GDP, Population, and PCE as shown in Table 4 and in Figures 3 and 4 demonstrates that any of these metrics could be used to reasonably estimate the apportionment of damages across subclasses.  The high correlation between these metrics is not surprising given that all these statistics are related.  As discussed above, the PCE data is simply a subcomponent of GDP.  Population is likely to track both PCE and Real GDP simply because the more people that reside in a certain state, the more economic activity is generated within that state.  Because these variables are all related, the distribution of the variables is likely to be very similar across states, which is demonstrated by the extremely high correlation coefficients in Table 8.

## IV.  RESERVATION OF RIGHTS

These calculations and estimates are based on the information and data currently available to me.  I understand that additional, different and/or updated data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my calculations and my testimony.

## VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 23rd day of March, 2016.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

# Exhibit 1

# Statement of Qualifications
# of

# COLIN B. WEIR



**Statement of Qualifications**

**COLIN B. WEIR**


Colin B. Weir is Vice President at Economics and Technology, Inc.   Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir  is familiar with common statistical and econometric software packages such as STATA and SHAZAM.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation;  liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; diminution in value; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a  Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, and serves as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND
TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

Mr. Weir has submitted the following testimony:

**United States District Court, District of New Jersey,** *In re: AZEK Decking Marketing & Sales Practices Litigation*, Case No. 12-cv-06627-MCA-MAH, on behalf of Seeger Weiss, LLP; Declaration submitted February 26, 2016.

**United States District Court. Northern District Of California,** *In re: Nest Labs Litigation*, Case No. 5:14-cv-01363-BLF, on behalf of Bursor & Fisher, P.A.; Declaration filed on January 22, 2016; Deposition on March 2, 2016.

**United States District Court, Northern District Of California,** *Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated, v. Salov North America Corp.; And Italfoods, Inc.*, Case No. 4:14-cv-02411-YGR, on behalf of Gutride Safier LLP; Declaration filed on January 19, 2016; Deposition on February 24, 2016.

**United States District  Court, Northern District of Ohio, Eastern Division,** *Christopher Meta, On Behalf Of Himself And All Others Similarly Situated v. Target Corporation, et al.*, Case No. 4:14-0832-DCN, on behalf of Tycko & Zavareei, LLP, Declaration filed January 6, 2016; Deposition on March 15, 2016; Reply Declaration submitted on March 18, 2016.

**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.,* Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Declaration filed December 28, 2015.

**United States District Court, District of New Jersey,** *In re: Tropicana Orange Juice Marketing and Sales Practices Litigation,* Case No. 12-cv-7382-WJM-JBC, on behalf of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC.; Declaration filed on November 6, 2015; Deposition on January 28, 2016.

**United States District Court, Northern District of California**, *Scott Koller, an individual, on behalf of himself, the general public and those similarly situated v. Deoleo USA, Inc. and Med Foods, Inc.*, Case No. 3:14-cv-02400-RS, on behalf of Gutride Safier LLP; Declaration filed on October 29, 2015; Deposition on December 21, 2015.

**United States District Court, Eastern District Of New York,** *Patrick Hughes and Nafisé Nina Hodjat, individually and on behalf of others similarly situated, v. The Ester C Company; NBTY, Inc.; and Naturesmart, LLC*, Case No. 12-cv-00041-JFB-ETB, on behalf of Reese LLP and WhatleyKallas LLP; Declaration filed October 22, 2015; Deposition on December 1, 2015.



**United States District Court, District Of Connecticut,** *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. General Electric Company*, Case No. 3:13-cv-01799-WWE, on behalf of Izard Nobel LLP; Declaration filed October 15, 2015; Deposition on November 17, 2015.

**United States District Court, District of New Jersey,** *Lynne Avram, on behalf of herself and all others similarly situated, v. Samsung Electronics America Inc., and Lowe's Home Centers, Inc.*, Case No. 11-cv-6973-KM-MCA, on behalf of Faruqi & Faruqi LLP; Declaration filed July 15, 2015; Deposition September 29, 2015.

**United States District Court, District of Connecticut,** *Heidi Langan, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies, Inc.*, Case No. 3:13-cv-01471-RNC, on behalf of Izard Nobel LLP; Declaration filed June 23, 2015; Deposition on July 21, 2015; Reply Declaration filed October 15, 2015.

**United States District Court, Eastern District of California,** *Yesenia Melgar, on behalf of herself and all others similarly situated, v. Zicam LLC, and Matrixx Initiatives, Inc.*, Case No. 2:14-cv-00160-MCE-AC, on behalf of Bursor & Fisher, PA; Declaration filed June 8, 2015.

**United States District Court, Central District of California, Eastern Division-Riverside** *Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, v. Abbott Laboratories, Inc.*, Case No. 12-01411-SVW(DTBx), on behalf of Baron & Budd; Declaration filed May 25, 2015; Deposition on June 2, 2015; Supplemental Declaration filed July 6, 2015.

**United States District Court, Central District of California,** *Russell Minoru Ono, individually and on behalf of others similarly situated, v. Head Racquet Sports USA, a corp. and Head USA Inc.*, Case No. 13-04222-FMO, on behalf of Baron & Budd; Declaration filed April 24, 2015, Deposition on June 30, 2015; Reply Declaration filed July 2, 2015.

**United States District Court, Southern District of Florida,** *Vanessa Lombardo, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies and Neutrogena Corporation*, Case No. 13-60536-SCOLA, on behalf of Morgan & Morgan; Declaration filed March  31, 2015.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark  Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed March 27, 2015.

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf  of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of Wolf Popper LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed April 30, 2015.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Patrick Hendricks, individually and on behalf of all others similarly situated, v. StarKist Co.*, Case No. 13-0729-YGR, on behalf of Bursor & Fisher, PA; Declaration filed January 20, 2015; Deposition on February 10, 2015; Reply Declaration filed April 7, 2015.

**United States District Court, Northern District of California, San Francisco Division,** *Scott Miller and Steve Leyton, individually and on behalf  themselves, the general public and those similarly situated v. Ghirardelli Chocolate Company*, Case No. 12-04936-LB, on behalf of Gutride Safier LLP, Declaration filed January 8, 2015; Reply Declaration filed February 5, 2015.

**United States Bankruptcy Court, Eastern District of New York,** *In re: Kangadis Food Inc., d/b/a The Gourmet Factory, Debtor*, Case No. 14-72649-REG, on behalf of Bursor & Fisher, PA; Declaration filed August 5th, 2014; Oral testimony on November 24, 2014.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014; Deposition on October 9, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration filed August 11, 2014; Deposition on September 30, 2014.

**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly, on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014; Declaration filed September 8, 2014; Deposition on September 16, 2014, Declaration filed October 27, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014; Declaration filed on January 8, 2016; Deposition on February 10, 2016.



**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014; Deposition on August 13, 2014; Declaration filed September 9, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,,* Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013; Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.



**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,**  *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228*, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, Plaintiffs, v. AT&T Mobility LLC, Defendant*, Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

7



**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.



# Exhibit 2

# Documents Reviewed



-Class Action Complaint, filed June 4, 2015.

-Declaration of Dr. Thomas L. Read, October 15, 2015.

-Defendant's Second Supplemental Response to Plaintiffs' First Request for Production of Documents, filed November 19, 2014.

-Defendant's Supplemental Response to Plaintiffs' First Set of Interrogatories, filed November 19, 2014.

-Deposition of James Gothard, April 30, 2015 (as corrected by errata sheet) and associated exhibits.

-Deposition of Ryan Buente, April 30, 2015 and associated exhibits.

-Declaration of Colin B. Weir, October 15, 2015.

-Deposition of Colin B. Weir, November 17, 2015.

-Expert Report of William S. Choi, Ph.D., January 4, 2016.

-Deposition of William Choi, Ph.D., March 8, 2016.

-Bureau of Economic Analysis (BEA), *Concepts and Methods of the U.S. National Income and Product Accounts*, "Chapter 5: Personal Consumption Expenditures", available at http://www.bea.gov/national/pdf/NIPAhandbookch5.pdf (accessed 3/21/2016).

-Nicholson, W. and Snyder, C., *Microeconomic Theory: Basic Principles and Extensions* (10th ed.), Thomson South-Western, 2008.

-Stock, J. H. & W. W. Watson, *Introduction to Econometrics* (3rd ed.). Boston: Addison-Wesley, 2011.

-Form 10-K 1998.pdf

-Form 10-K 1999.pdf

-Form 10-K 2000.pdf

-Form 10-K 2001.pdf

-Form 10-K 2002.pdf

-Form 10-K 2003.pdf

-Form 10-K 2004.pdf



-Form 10-K 2005.pdf

-Form 10-K 2006.pdf

-Form 10-K 2007.pdf

-Form 10-K 2008.pdf

-Form 10-K 2009.pdf

-Form 10-K 2010.pdf

-Form 10-K 2011.pdf

-Form 10-K 2012.pdf

-Form 10-K 2013.pdf

-Form 10-K 2014.pdf

-GE-MWO-NATIONAL-SALES-1090+1095MODELS-1996-PRESENT sent 7_24_2014.XLSX

-GE_RC063312_Confidential Harkey Financial Data.xlsx

-GE_RC063631-66

-GE_RC063833_Confidential_1090 1095 CA FL TX Sales Data2.xlsx

-GE_RC064115_Confidential_MWO_HARKEY prod final.XLSX

-Harkey Data Final (CEP edits).xlsx

-Harkey Data Final.xlsx

-Harkey -OH_NY_w_GSB all 1090_1095 MWO _from_1996_to_May_31_2014.XLSX

-http://www.census.gov/popest/

-http://www.bea.gov/regional/

-Second Amended Class Action Complaint, filed July 14, 2014.

-ST-EST00INT-01.xls

-GE_RC064116-726 (Choi Document Production)

-GE_RC064137_CONFIDENTIAL_Cost_of_Repair.dta

-GE_RC064149_CONFIDENTIAL_Wyner_broken MWO.xlsx

-GE_RC064154_CONFIDENTIAL_Alix edit_GE_RC064115_Repairs.xlsx

-GE_RC064156_CONFIDENTIAL_no glass door descriptions 2015-11-12v1.xlsx



-GE_RC064161_CONFIDENTIAL_Alix edit_GE_RC064115_Repairs.xlsx

-GE_RC064164_CONFIDENTIAL_Alix edit_GE_RC064115_Repairs.xlsx

-GE_RC064603_CONFIDENTIAL_GE_RC064084_Confidential_Copy of Copy of GE-MWO-

NATIONAL-SALES-1996-PRESENTper unit basis sent 12 3 (DS).xlsx

ECONOMICS AND
TECHNOLOGY, INC.

**Exhibit 3**

**Consumer Protection Law Subclass
Individual State Damage Calculations**



| GE Diminution in Value Damages: Median Cost to Repair Consumer Protection Law Subclass | | | |
|---|---|---|---|
| State | Number of Units | Cost to Repair | Diminution in Value Damages |
| Alaska | | $239.95 | $45,830 |
| Arkansas | | $239.95 | $135,572 |
| Connecticut | | $239.95 | $225,793 |
| Delaware | | $239.95 | $39,592 |
| District of Columbia | | $239.95 | $35,273 |
| Hawaii | | $239.95 | $76,064 |
| Illinois | | $239.95 | $666,101 |
| Michigan | | $239.95 | $523,571 |
| Missouri | | $239.95 | $298,018 |
| Nebraska | | $239.95 | $107,498 |
| New Jersey | | $239.95 | $581,879 |
| Rhode Island | | $239.95 | $47,270 |
| Vermont | | $239.95 | $34,073 |
| Washington | | $239.95 | $378,161 |
| Wisconsin | | $239.95 | $291,059 |
| **Total** | | | **$3,485,754** |



| GE Diminution in Value Damages: "Door Only" Cost to Repair Consumer Protection Law Subclass | | | |
|---|---|---|---|
| State | Number of Units | Cost to Repair | Disgorgement Damages |
| Alaska | | $244.62 | $46,722 |
| Arkansas | | $244.62 | $138,210 |
| Connecticut | | $244.62 | $230,187 |
| Delaware | | $244.62 | $40,362 |
| District of Columbia | | $244.62 | $35,959 |
| Hawaii | | $244.62 | $77,545 |
| Illinois | | $244.62 | $679,065 |
| Michigan | | $244.62 | $533,761 |
| Missouri | | $244.62 | $303,818 |
| Nebraska | | $244.62 | $109,590 |
| New Jersey | | $244.62 | $593,204 |
| Rhode Island | | $244.62 | $48,190 |
| Vermont | | $244.62 | $34,736 |
| Washington | | $244.62 | $385,521 |
| Wisconsin | | $244.62 | $296,724 |
| **Total** | | | **$3,553,595** |

